IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC ALLEN ZEHNER, | ) | CASE NO. 3:18CV2620 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES G. CARR |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Eric Zehner ("Zehner") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

Zehner protectively filed applications for DIB and SSI in June 2015, alleging a disability onset date of May 18, 2009.[1] Tr. 282, 284. He alleged disability based on the following: knee surgery and neck surgery, degenerative disc disease in his cervical spine, numbness in both arms from elbow to finger, "drops things due to numbness and lack of feeling in hands," depression, anxiety, bi-polar disorder, "thyroid issue," OCD, high blood pressure, "ankles and feet swell up into the calf area," and migraines. Tr. 315. After denials by the state agency initially (Tr. 127, 128) and on reconsideration (Tr. 197, 198), Zehner requested an administrative hearing. Tr. 225.

---

[1] Zehner had filed a prior application that was denied on December 8, 2011. Tr. 15.

A hearing was held before an Administrative Law Judge ("ALJ") on October 6, 2017.  Tr. 36-90.

In her March 15, 2018, decision (Tr. 15-29), the ALJ declined to reopen Zehner's prior

application and determined that there are jobs in significant numbers in the national economy

that Zehner can perform, i.e., he is not disabled.  Tr. 16, 27-29.  Zehner requested review of the

ALJ's decision by the Appeals Council (Tr. 280) and, on September 13, 2018, the Appeals

Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr.

1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Zehner was born in 1978 and was 31 years old on his alleged onset date.  Tr. 27.  He has

a GED and had taken welding classes in the past.  Tr. 47.  He previously performed work in fast

food restaurants and as a bartender.  Tr. 48-51.

### B.  Relevant Medical Evidence[2]

In March 2010, Zehner had an initial assessment at the Maumee Valley Guidance Center

and reported heightened anxiety causing frequent headaches and depression.  Tr. 390.  He was

diagnosed with bipolar disorder NOS.  Tr. 390.

In June 2011, Zehner saw neurosurgeon Edmund Lawrence, Jr., M.D., for a surgical

consultation.  Tr. 398.  He reported having neck pain for the last 3½ years that had progressed to

the point where he now had neck pain at a very high level.  Tr. 398.  He also had numbness and

tingling in the tips of his fingers on his right hand.  Tr. 398.  He stated that he had failed physical

therapy and epidural blocks, and he had seen another neurosurgeon, Dr. Spetka, who had told

him that he "could make his MRI scan look better but that he did not think the pain would go

---

[2] Because the denial of Zehner's prior claim became final on December 8, 2011, the undersigned briefly refers to
evidence in the record prior to that date to provide context and more fully sets forth evidence of record after that
date.

away."  Tr. 398.  Upon exam, he had weakness in his right triceps, sensory loss at C7 on the right, and no triceps or biceps reflexes on the right.  Tr. 399.  His MRI showed two large disc/spur combinations at C5-C6 and C6-C7, worse at C6-C7.  Tr. 399.  Dr. Lawrence recommended a decompression and fusion surgery.

Dr. Lawrence performed an anterior cervical fusion.  At a follow-up on August 11, 2011, he stated, "Zehner has done beautifully."  Tr. 397.  He commented that Zehner reported doing "much better; 120%, in fact."  Tr. 397.

In September 2011, Zehner had an initial assessment at the Maumee Valley Guidance Center.  Tr. 403-404.  He complained of anger, fidgeting, constantly shaking feet and legs, temper outbursts, and anger at his father, whom he had almost had a physical altercation with earlier that day.  Tr. 403.  He described a troubled upbringing.  Tr. 403.  He reported prior employment in fast food services and temporary jobs; his attitude towards work was "It gets me [] out of the house.  I love it."  Tr. 403.  His current medications included Vicodin as needed.  Tr. 403.  He complained of excessive fatigue and insufficient sleep, although he was unsure how much sleep he was getting.  Tr. 403-404.  He was diagnosed with bipolar disorder NOS and was scheduled for, and referred to, a variety of therapies.  Tr. 404.

In October 2011, Zehner returned to Dr. Lawrence reporting "some numbness and some tingling in his hands when he works too hard."  Tr. 1165.  Dr. Lawrence stated, "I think at this point he needs to push himself a bit."  Tr. 1165.

On April 16, 2012, Zehner sought treatment for right hand and wrist pain; he had become angry when his favorite pool stick broke and he punched a dresser and slammed his hand down four or five times.  Tr. 622, 624.  He was diagnosed with joint pain in his wrist, prescribed ibuprofen and Tylenol, given a splint to wear, and x-rays were ordered.  Tr. 624.

On August 17, 2012, Zehner went to the emergency room complaining of a right sided headache that began on the right side of his neck.  Tr. 1030.  He denied weakness, numbness or tingling.  Tr. 1030.  Upon exam, he had a right sided cervical muscle spasm.  Tr. 1030-1031.  He was treated and discharged and instructed to follow up with his surgeon if his symptoms persisted.  Tr. 1031.

On December 14, 2012, Zehner visited the emergency department after slamming his right fist down while playing pool the night before, causing pain and swelling.  Tr. 458.  X-rays showed no obvious fracture and he was told to ice his hand and take Tylenol or Advil for pain.  Tr. 458.

On February 13, 2013, Zehner attended one physical therapy session for his right hand and wrist; he failed to appear for further appointments and was discharged from treatment.  Tr. 450.

On October 6, 2014, Zehner went to the emergency room after he banged his elbow on a metal pipe while attempting to grab his friend's foot to startle him at 1:00 a.m.  Tr. 433.  Upon exam, he was tender to palpation medially at his elbow, which reproduced pain and tingling down his arm.  Tr. 433-434.  He was diagnosed with neuropraxia; it was explained to him that he bumped and bruised the nerve that passes along his elbow.  Tr. 434.  He was prescribed medication and instructed to follow up with his primary care physician.  Tr. 434.

On October 10, 2015, a CT scan of Zehner's cervical spine showed moderate to severe narrowing at C3-4 and C4-5.  Tr. 1119.

On May 19, 2016, Zehner had a check-up with a nurse practitioner for his back and neck pain.  Tr. 829.  Upon exam, he had a normal gait, full strength in all his extremities, decreased grip strength bilaterally, and normal reflexes.  Tr. 832.  At a follow-up appointment on June 20,

Zehner had a normal gait, full strength in all his extremities, normal reflexes and normal sensation.  Tr. 836.

On August 16, 2016, a cervical spine MRI showed the same findings as the 2015 CT scan, as well as a small disc herniation midline at C7-T1.  Tr. 851.

On September 6, 2016, Zehner saw neurosurgeon Leo Clark, M.D., for a consultation. Tr. 1152.  Dr. Clark found that Zehner was developing cervical spondylosis at C3-C4 and C4-C5, the two levels above his old fusion, and foraminal nerve root compression at those levels as well, likely causing motion-related pain in his neck and arms.  Tr. 1154.  Dr. Clark advised a second surgery to remove the surgical hardware from the first surgery and to create a new anterior fusion.  Tr. 1154.  Zehner agreed and this surgery was performed on September 30.  Tr. 1156.

On November 15, 2016, Zehner saw Dr. Clark for a follow up.  Tr. 1151.  Zehner reported some pain in his shoulder blades, which Dr. Clark advised was normal and would subside once the fusion solidified.  Tr. 1151.  Upon motor exam, Zehner had full strength in all extremities, which Dr. Clark found to be "a great improvement from his preoperative condition." Tr. 1151.  He was encouraged to walk on a daily basis vigorously enough to make his arms swing.  Tr. 1151.

On January 10, 2017, Zehner returned to Dr. Clark, who reported that he had last seen Zehner in mid-November and that he had been doing well.  Tr. 1150.  Zehner stated that he had returned to work, but, while at work, he had struck his head on a protruding tray and felt pain in his neck.  Tr. 1150.  Imaging showed an osteophytic ridge at the C4-C5 level "obliterating the neural foramina."  Tr. 1148.

On September 18, 2017, Zehner underwent a third surgery—a cervical decompressive

laminectomy at C4-C5. Tr. 1208.

### C. Zehner's Reports

#### 1. Disability report, October 21, 2015

Zehner stated that, beginning in the summer of 2015, he started losing consciousness. Tr. 334. He went to the ER and his doctor placed him on a heart monitor and they were awaiting the results. Tr. 334. Also, he experiences a loud "pop" in his neck at times. Tr. 340. This happened right before he went unconscious the first time. Tr. 340. It also happened during his disability appointment with the consultative examiner, and when the doctor heard it he was startled and said, "no more testing!" Tr. 340.

Zehner reported that he uses a handicap accessible shower with a bench seat. Tr. 339. His hand numbness prevents him from doing a lot of things alone. Tr. 339. He drops things often and has broken enough dishes that his wife does not like him to attempt dishes. Tr. 339.

#### 2. Function Reports

July 19, 2015: Zehner stated that, due to his impairments, he is very slow. Tr. 322. He prepares his own meals, can cook "pretty much everything," and his wife and kids help sometimes. Tr. 323. If he even lifts light objects and/or bends softly, his neck, arms and legs go numb and a headache begins. Tr. 323. He plays video games every day, plays with his kids as much as he can, and plays pool, but not as much as he used to. Tr. 324. "Sometimes I do well and sometimes I am unable to." Tr. 324. He picks up after his kids, folds laundry, sweeps, mops, "etc," throughout the day. Tr. 323. He needs words of encouragement to get these chores done. Tr. 323.

September 27, 2015: Zehner stated that, when he turns his head, his neck pops and he has to sit down. Tr. 327. His hands and arms go numb and he has no feeling, his hands get tingling

when he "puts [them] in any temperature," and he gets headaches.  Tr. 327.  His wife reminds

him to take his medicine.  Tr. 328.  He usually makes lunch and sometimes dinner if his wife is

not home.  Tr 328.  He does laundry, cleaning, and picks up after his kids.  Tr. 328.  He has no

hobbies because of his illness.  Tr. 329.  He gets angry more often.  Tr. 329.

### 3. Agency's Report of Claimant Contact dated October 30, 2015

During his appeal of the agency's initial determination that he was not disabled, Zehner

returned a call from the agency regarding whether his ability to function has remained the same

since his initial application.  Tr. 342.  Zehner answered that he needs help cooking; he can't

focus on one thing, everything clashes together, and he gets frustrated.  Tr. 342.  He felt like he

needs help doing anything he tries to do.  Tr. 342.  His inability to focus causes him to "just get

up and walk away then he gets depressed because he can't do it (anything)."  Tr. 342.

### 4. Activities Questionnaire dated April 26, 2016

Zehner stated that he is in constant pain all day, he is weak, he cannot do a lot of cleaning

or playing with his kids, and he "tak[es] constant breaks."  Tr. 347.  It takes him about 15

minutes to walk 10 to 15 feet.  Tr. 347.  On an average day, he gets his kids ready for school,

walks them to the bus stop, and goes back inside and sits down; he is unable to feel his legs and

his arms and hands are numb.  Tr. 347.  He sits for a while, eats, and then picks up in the kitchen

somewhat, taking breaks because his neck starts to burn and his hands go numb.  Tr. 347.  He

sits until his kids come home from school then he helps them with homework and dinner.  Tr.

347.  He drives a car but can do so for no more than 30 minutes.  Tr. 348.

### D. Opinion Evidence—Consultative Examiner

On September 19, 2015, Zehner saw Babatunde Onamusi, M.D., for a consultative

examination.  Tr. 580-582.  Upon exam, he had an unimpaired memory, satisfactory attention

span, normal muscle power and tone in all muscle groups, intact sensation and reflexes, no edema, a negative Romberg test, and a normal gait.  Tr. 581-582.  He had a moderately stooped posture in his upper back and decreased range of motion in his cervical spine.  Tr. 581.  He had no trouble transferring on and off the exam table and he was able to squat, kneel, and walk in tandem, stand on heels and toes, and grip and grasp with both hands.  Tr. 581-582.  His grip strength was 40 pounds bilaterally.  Tr. 582.  He was able to reach forward, push and pull with his upper extremities, and use his hands for fine coordination and manipulative tasks.  Tr. 582. He reported severe neck pain with shoulder adduction and declined further shoulder range of motion testing.  Tr. 582.  Upon range of motion testing in his neck, he had a slight "pop" in his neck with active lateral bending, began crying, and examination of the neck was discontinued. Tr. 582.  Dr. Onamusi opined that Zehner could perform sedentary work and activities that require frequent, rapid or extreme neck movements would be intolerable.  Tr. 582.

### E.  Testimonial Evidence

#### 1.  Zehner's Testimony

Zehner was represented by counsel and testified at the administrative hearing.  Tr. 38.  He lives with his wife and three children.  Tr. 45.  His wife works and Zehner takes care of the children while she is working.  Tr. 46.

When asked why he was unable to perform work, Zehner stated that he did not think he could keep up with people and that weight restrictions are the major issues.  Tr. 53.  He had had his third and most recent neck surgery one month prior to the hearing and was on a two-pound weight restriction.  Tr. 53.  The ALJ asked him about the treatment note from Dr. Lawrence that indicated Zehner was doing beautifully following his cervical fusion in June 2011, and Zehner stated that he did not agree with Dr. Lawrence's statement.  Tr. 53-54.  He explained that his

8

headaches started coming back more and he was having more pain in his arms.  Tr. 54.  It was hard for him to change a diaper and get himself dressed on Sundays.  Tr. 54.  When asked how frequently he had headaches before his surgery, Zehner stated he had headaches about three to five times a month and they included severe pain with nausea and vomiting.  Tr. 54-55.  Sometimes they would last for three to four days.  Tr. 55.  On those days he could still care for his children, although it was very challenging; most of the time his son, who was six at the time, would help him.  Tr. 55.  His son would set the table and getting a box of macaroni and cheese out, which Zehner would then prepare.  Tr. 55.

Zehner described his headaches: they start in the middle of his neck and run up the side and it feels like someone is pulling a muscle out.  Tr. 58.  Also, he is unable to lift his left arm without supporting it with the right hand.  Tr. 58-59.  His arm is numb and tingly and when he puts a coat on it feels like he is getting skinned alive.  Tr. 59.  His range of motion has deteriorated after every surgery he has had.  Tr. 59.  His older son helps him get dressed.  Tr. 63.  He can roll out of bed, get on his knees, and slowly stand up, but other times his wife helps him get out of bed.  Tr. 63.

Zehner is able to drive a car; he drives carefully and slowly.  Tr. 64.  He can grip the steering wheel only with the thumb and two fingers on his left hand.  Tr. 67.  His wife does not have a license so he drives her wherever she goes, including back and forth to and from work.  Tr. 65.  He goes grocery shopping with his wife or kids; sometimes he can push the shopping cart but most of the time he gets a motorized cart to ride in.  Tr. 66.  He can lift a half-gallon of milk off the shelf but it takes two hands for him to do it.  Tr. 66.  When asked why he could not perform his past work as a bartender, Zehner answered that he does not have the range of motion in his upper arms to swing a mop.  Tr. 68.  He is unable to open the lid of a water bottle but he

can turn the knobs on his kitchen sink.  Tr. 68-69.  He is able to stand for 15 minutes before

needing to sit down due to shoulder and lower neck pain.  Tr. 74.  He is able to sit for 10 to 15

minutes before having to move from one side to the other.  Tr. 74.  Sometimes sitting in a

recliner helps.  Tr. 74-75.  He tries to do the dishes; he can do five or six plates and then his

hands go numb and his kid will finish the dishes.  Tr. 75.

Zehner has been diagnosed with a history of alcohol and marijuana abuse.  Tr. 77.  He

has not used alcohol in two months and he has not used marijuana in a year or two.  Tr. 78-79.

When asked to confirm that he was taking no medication in July 2017 (other than using

hydrocortisone creme for a bout of poison oak), as he had indicated on his medication list

provided to the ALJ, Zehner confirmed that he had not been taking any medication at that time.

Tr. 81.

Regarding his mental health issues, Zehner has been diagnosed with depression, anxiety,

bipolar, and OCD.  Tr. 72.  He does not take any medication for these issues.  Tr. 81.  He used to

take Seroquel and something else, but "it took me out of my aura" and his prescription was

stopped.  Tr. 81.  It has been "a while" since he attended counseling; he had been going twice a

month and it was helping.  Tr. 82.  He got a lot of stuff off his chest and it made him feel a lot

better.  Tr. 82.

**2. Zehner's Wife's Testimony**

Zehner's wife also testified at the hearing.  Tr. 83.  She stated that she has lived with

Zehner for twelve years; since before his first surgery in 2011 she has been helping him get

dressed, get around, remind him to do things, and help with the kids more.  Tr. 83.  She makes all

the appointments because he doesn't remember to do it.  Tr. 83.  He was in a lot more pain after

his most recent surgery, which he had a month prior to the hearing.  Tr. 84.

### 3.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 86-89.  The ALJ discussed with the VE Zehner's past work as a bartender and asked the VE to determine whether Zehner could perform his past work or any other work if he had the limitations assessed in the ALJ's RFC determination.  Tr. 87-88.  The VE answered that such an individual could not perform Zehner's past work but could perform other work in the national economy such as a bench worker, bonder, and assembler.  Tr. 88.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her March 15, 2018, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.  Tr. 18.

2.      The claimant has not engaged in substantial gainful activity since May 18, 2009, the alleged onset date.  Tr. 18.

3.      The claimant has the following severe impairments: cervical radiculopathy, status/post three cervical fusion surgeries; incomplete rupture of right rotator cuff and bicipital tenosynovitis; migraine headaches; degenerative disc disease of the lumbar spine; left hip osteoarthritis; alcohol use disorder; marijuana abuse; and mental impairments variously described as bipolar disorder, depression, anxiety

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

disorder, and obsessive compulsive disorder.  Tr. 18.

4.      The claimant does not have an impairment or combination of
        impairments that meets or medically equals the severity of one of the
        listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 19.

5.      The claimant has the residual functional capacity to perform sedentary
        work as defined in 20 CFR 404.1567(a) and 416.967(a), except he can
        only occasionally climb ramps and stairs, never climb ladders, and can
        occasionally stoop, kneel, crouch, and crawl.  He can frequently handle,
        finger, and reach overhead bilaterally.  He must avoid all exposure to
        workplace hazards, such as dangerous moving machinery and
        unprotected heights.  He is further limited to simple tasks that are not
        fast-paced, meaning the pace of productivity is not dictated by an external
        source over which he has no control.  He can have only occasional
        interaction with coworkers and supervisors, and no interaction with the
        public.  The routine should be repetitive from day-to-day, with few
        unexpected changes.  Tr. 21.

6.      The claimant is unable to perform any past relevant work.  Tr. 27.

7.      The claimant was born in 1978 and was 31 years old, which is defined as
        a younger individual age 18-49, on the alleged disability onset date.  Tr.
        27.

8.      The claimant has at least a high school education and is able to
        communicate in English.  Tr. 27.

9.      Transferability of job skills is not material to the determination of
        disability because using the Medical-Vocational Rules as a framework
        supports a finding that the claimant is "not disabled," whether or not the
        claimant has transferable job skills.  Tr. 27.

10.     Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the
        national economy that the claimant can perform.  Tr. 27.

11.     The claimant has not been under a disability, as defined in the Social
        Security Act, from May 18, 2009, through the date of this decision.  Tr.
        29.

## V. Plaintiff's Arguments[4]

Zehner challenges the ALJ's decision on the basis that her step five determination is not

---

[4] Zehner's brief frequently fails to clearly set forth the precise legal issues he raises or the arguments in support.
The undersigned has made best efforts to identify the legal issues he raises and the reasoning in support.

supported by substantial evidence, her consideration of opinion evidence is faulty, she did not

follow the two-step method for evaluating substance abuse, and she erred with respect to her

treatment of Zehner's prior application.  Doc. 15, pp. 4-5.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

### A. Zehner's challenge to the ALJ's treatment of his prior application fails

Zehner filed a prior application for DIB and SSI that was denied and deemed final on

December 8, 2011.  Tr. 15-16.  Thereafter, in 2015, he filed the instant application for DIB and

SSI.  Tr. 15.  The ALJ considered his 2015 application to have contained an implied request to

reopen his prior application.  Tr. 15-16.  The ALJ declined to reopen Zehner's prior application.

Tr. 16.  Zehner argues that the ALJ erred because, in her decision, she "claims to have reviewed

the prior decision for reopening" and declined to reopen his prior application, "but no evidence

whatsoever shows that she has done any such review even in the slightest."  Doc. 15, p. 20.  He

claims that this violates 20 C.F.R. § 404.988, SSR 91-5p, and the rule in *Drummond v. Comm'r*

*of Soc. Sec.*, 126 F.3d 837 (1997).  Doc. 15, p. 20.  Zehner's arguments fails.

First, the agency's decision not to reopen a prior application is not a final decision, and, therefore, it is not reviewable on appeal in federal court, unless a claimant makes a colorable constitutional claim.  *Harper v. Sec'y of Health & Human Servs.*, 978 F.2d 260, 262 (6th Cir. 1992).  Here, Zehner has not made any constitutional claim.  Even if he had, SSR 91-5p, "Mental Incapacity and Good Cause for Missing the Deadline to Request Review," requires a showing of (1) mental incapacity and (2) a "lack of anyone legally responsible for prosecuting the claim." *Anderson v. Comm'r of Soc. Sec.*, 195 Fed. App'x 366, 369 (6th Cir. 2006).  The claimant has the burden to show he meets these requirements.  *Id*.  Zehner does not even allege mental incapacity and lack of legal counsel.  Moreover, a claimant bears the burden of establishing he is entitled to reopening pursuant to 20 C.F.R. § 404.988.  *Glazer v. Comm'r of Soc. Sec.*, 92 Fed. App'x 312, 315 (6th Cir. 2004) (citing *Gosnell v. Sec'y of Health & Human Servs.*, 703 F.2d 216, 218-219 (6th Cir. 1983)).  Zehner has not met his burden; he has not even identified which of the many sub-sections of § 404.988 purportedly entitles him to reopening.  In short, he has not demonstrated that the ALJ's decision to not reopen is reviewable by this Court.

Zehner also complains that the ALJ violated the rule in *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997).  He states, "The *Drummond* rule requires the subsequent ALJ to either expand or simply maintain the same RFC limitations of the prior ALJ" and complains that the Commissioner certified the record without tracking down the prior ALJ's decision.  Doc. 15, pp. 20-21.  But there was no prior ALJ decision in Zehner's case.  Zehner did not appeal the denial of his prior application past the initial determination level.  See, e.g., Tr. 92 (Zehner's claim file referencing a determination date (December 8, 2011) at the initial level); 312 (agency field office disability report: "Date and level of last decision: 12/08/2011 Initial"); Tr. 16-17

(ALJ's decision: "[T]he claimant filed a previous Title II and Title XVI claim.  A determination that the claimant was not disabled was made on December 8, 2011.  This determination became administratively final when the claimant did not file a timely appeal[,]" citing 20 CFR 404.905 and 416.1405, entitled, "Effect of an initial determination.").  In short, Zehner has not shown that the rule in *Drummond* applies to his case and this argument also fails.

### B. The ALJ did not err with respect to Zehner's concentration, persistence and pace limitations

Zehner argues that the ALJ erred because she found him to have moderate limitations in concentration, persistence and pace at step three but did not account for any concentration or persistence limitations in her RFC assessment or hypothetical posed to the VE.  Doc. 15, pp. 15-16 (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-517 (6th Cir 2010)).  Zehner asserts, "The ALJ opinion's own assertions that of course its [unstated: lack of] CPP limitations make sense lacks substantial evidence and does match its own findings."  Doc. 15, p. 16.

In *Ealy*, the ALJ had found that the claimant had moderate limitations in concentration, persistence and pace, relying on an opinion that also found the claimant limited to completing simple, repetitive tasks of two-hour segments where speed was not critical.  594 F.3d at 516.  The court found that the ALJ erred because the ALJ failed to include the "two-hour segments" and critical speed limitation in the RFC and the hypothetical posed to the VE.  *Id*.  Here, in contrast, Zehner does not identify an opinion in the record relied upon by the ALJ wherein it was opined that he had a specific limitation that the ALJ did not include in the RFC or VE hypothetical.

Furthermore, the ALJ's finding that Zehner had moderate limitations in concentration, persistence and pace at step three is not inconsistent with the ALJ's RFC that limited Zehner to simple tasks that are not fast-paced, occasional interaction with coworkers and supervisors and

no interaction with the public, and routine, repetitive work with few unexpected changes.  Tr. 21.
*See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. App'x 426, 436-437 (6th Cir. 2014) (the
ALJ's finding that the claimant had moderate limitations in the ability to maintain attention and
concentration, persistence and pace was adequately conveyed by an RFC and hypothetical to the
VE limiting the claimant to simple, routine, repetitive tasks; the court further observed that the
medical opinion relied upon by the ALJ did not include more specific limitations like those
found in *Ealy*).

Zehner complains that the ALJ limited him to occasional interaction with supervisors and
coworkers but did not limit the quality of the interaction.  Doc. 15, p. 16 (citing Tr. 20).  But the
ALJ explained that no treating or examining source noted any difficulties interacting with Zehner
and that Zehner had stated that he spends time with family and friends and "gets along very well
with authority figures," including bosses.  Tr. 20 (citing Tr. 329-330 (Zehner's function report)).
This is evidence that supports the ALJ's RFC assessment that limited Zehner to the quantity of
interaction with others but not the quality.  Zehner does not identify evidence in the record
wherein the quality of his interaction with others was implicated.  To the extent Zehner asserts
that any other mental limitations included in the RFC were unsupported by substantial evidence,
he has not identified any specific limitations in the RFC that he claims are unsupported by the
record.  Thus, this argument has not been fleshed out and is therefore waived.  *See McPherson v.
Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner,
unaccompanied by some effort at developed argumentation, are deemed waived.  It is not
sufficient for a party to mention a possible argument in the most skeletal way, leaving the court
to . . . put flesh on its bones." (internal citations omitted)).

Finally, Zehner's complaint that the ALJ did not include limitations assessed by

consultative examiner Neil Shamberg, Ph.D., (Doc. 15, p. 16) fails.  Dr. Shamberg rendered an

opinion in connection with Zehner's prior application for disability benefits and the ALJ did not

re-weigh that evidence because she declined to reopen his prior application, Tr. 26-27, a finding

that is not reviewable by this Court, as set forth above.

### C. Zehner has not identified an error with respect to the ALJ's credibility assessment

Zehner appears to challenge the ALJ's credibility assessment when he states, "The initial

surgery that failed is integral to the claimant's credibility during the whole period."  Doc. 15, p.

17.  He complains that the ALJ cited a treatment note from Zehner's neurosurgeon that Zehner

was "much better [two months after surgery]; he says 120%, in fact."  Tr. 22-23.  Zehner

suggests that it was error for the ALJ to cite this piece of evidence, "as if the most reliable piece

of evidence on record, disproving consistency otherwise."  Doc. 15, p. 17.  He suggests that he

was on "*heavy* pain medications immediately post-surgery" and that his self-described "gushing"

to his doctor is a sign that he was on heavy pain medication.  Doc. 15, p. 17.  He argues that the

ALJ left out what the prior neurosurgeon, "who the record shows to be correct overall," said—

that symptoms persisted despite surgery.  Doc. 15, p. 17.  Lastly, he complains that the ALJ did

not discuss a visit that "would seem to line up with afterwards Zehner being unable to get his

pain medication anymore."  Doc. 15, p. 18.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of

credibility.  *Garner*, 745 F.2d at 387.  Nor does the Court fault an ALJ for failing to make

inferences and assumptions not indicated in the record.  And that is what Zehner is asking this

Court to do.  Moreover, he takes liberties with the record.  He first states that Dr. Spetka declined

to perform surgery (Doc. 15, pp. 9, 17), but the record he cites does not indicate that Dr. Spetka

"declined" to perform surgery; rather, Zehner told Dr. Lawrence that Dr. Spetka told him that he

could make his MRI look better but that he did not think the pain would go away.  Tr. 398.

Zehner also states, "Dr. Lawrence admitted such lack of pain/symptoms was not customary for

assessing someone with Zehner's physical findings."  Doc. 15, pp. 9, 17.  This "admission" by

Dr. Lawrence is not found in the record pages Zehner cites (Tr. 395, 397).

Zehner complains that the ALJ attributed a comment in an October 2011 treatment note

to his primary care physician, Dr. Reiter, but that the comment was actually made by Dr.

Lawrence.  Doc. 15, p. 17 (citing Tr. 23).  This is true; the ALJ incorrectly attributed the

comment to Dr. Reiter, not Dr. Lawrence.  However, Zehner does not explain how this mistake

amounts to reversible error.  Zehner's challenges to the ALJ's credibility assessment and reliance

upon the record fail.

### D. The ALJ did not err with respect to the treating physician opinion or the evidence regarding Zehner's paresthesia in his hands

Zehner asserts that the ALJ erred with respect to the "treating physician opinions."  Doc.

15, p. 18.  He does not identify what treating physician opinions he is referring to.  There do not

appear to be any treating physician opinions in the record.

Zehner argues that the record supports ongoing hand problems due to paresthesia.  Doc.

15, p. 18.  However, he does not identify an error on the part of the ALJ.  And, again, Zehner's

citations to the record are not proper because they require the Court to make inferences in his

favor not apparent in the record.  For example, he cites an emergency room note from October

2011 (four months after his surgery) when he complained of back and neck pain after he fell off

a ladder, landed on his right wrist and then rolled onto his back.  Doc. 15, p. 18 (citing Tr. 502).

He urges the Court to consider that it "does not seem mere coincidence that in October 2011 he

would have been unable to properly hold the rungs of a ladder and so fell off[.]"  Doc. 15, p. 18.

The emergency room treatment note does not state that Zehner fell off the ladder because he was

unable to hold onto it.  The Court declines to speculate that that is what occurred, and the ALJ

did not err when she failed to speculate that that is what occurred.  Next, he points to

"interrelated muscle spasms in August 2012 and him jamming his hand."  Doc. 15, p. 18 (citing

Tr. 475-476).  The cited records show that he jammed his thumb on August 7, 2012, when, after

drinking 4 beers, he was working on a tire on an oversized pick-up truck and the tire bounced up

and jammed his left thumb.  Tr. 476.  Upon exam he had full muscle strength.  Tr. 476.  And on

August 17, 2012, Zehner drove himself to the emergency room and was diagnosed with muscle

spasms and migraine.  Tr. 474-475.  He was given medication and drove himself home.  Tr. 474-

475.  There is no ALJ error implicated by these records.

Zehner cites to an urgent care treatment note from October 2012, when Zehner hurt his

ankle after slipping down three stairs.  He urges the Court to find that this shows that "he would

not have had a solid hold of a railing."  Doc. 15, p. 18 (Tr. 1022).  No where does the treatment

note indicate that Zehner slipped on the stairs because he could not hold onto the railing or even

that there was a railing.  Zehner cites to an emergency room note and a follow up physical

therapy visit from when he injured his hand after purposefully slamming his fist down onto the

edge of a pool table when he was upset due to missing a shot.  Doc. 15, p. 18 (citing 454, 458).

These records do not show that Zehner had specific limitations due to paresthesia in his hands.

Zehner faults the ALJ for not including a limitation due to his "opined median nerve

distribution problem."  Doc. 15, p. 18 (citing Tr. 433-434).  He does not state what limitations he

has that stem from this impairment.  The treatment note he cites is his emergency room visit

when he banged his elbow on a metal pipe while attempting to grab his friend's foot to startle

him at 1:00 a.m.  Tr. 433.  The ALJ considered Zehner's elbow issues and De Qrervian's

tenosynovitis diagnosis, found that these impairments were not severe, and stated that the record

does not reflect ongoing treatment for these conditions.  Tr. 18-19.  Zehner does not challenge

these findings by the ALJ.  He cites Tr. 899 as demonstrating "the extent of the opined actual

weakness documented and opined upper extremity weakness associated with chronic neck pain."

Doc. 15, p. 18.  That treatment note (Tr. 899) is from a nurse practitioner on September 16, 2016,

wherein Zehner complained of bilateral hand weakness and numbness; upon exam he had a full

range of motion and full strength in all extremities.  Tr. 899.  He was diagnosed with cervical

myelopathy and chronic neck pain.  Tr. 899.  The note contains no opinion.  And the ALJ

considered Zehner's neck pain and the fact that his upper extremity limitations "stem primarily

from his cervical spine and shoulder impairments."  Tr. 19.  Finally, Zehner points out that in

February 2013 his physical therapy "goal[]" was listed as "hand strengthening."  Doc. 15, p. 18

(citing Tr. 449).  This note also listed his prognosis as "excellent"; however, Zehner never

returned to physical therapy after this initial visit and he was, therefore, discharged.  Tr. 450.  In

sum, Zehner has not identified an error on the part of the ALJ or shown that her decision is not

supported by substantial evidence.

### E. The ALJ did not err when she mentioned Zehner's substance abuse

Zehner argues that the ALJ erred because she did not follow the "two-stage method for

evaluating substance abuse."  Doc. 15, p. 19 (citing 20 CFR § 404.1535).  He concedes that the

ALJ is only required to follow the regulations for evaluating substance abuse when the ALJ finds

the claimant disabled.  Doc. 15, p. 19.  Because the ALJ did not find Zehner disabled, she was

not required to follow the two-step method set forth in the regulation regarding substance abuse.

Zehner argues that the ALJ erred because, despite finding him not disabled, she

mentioned "inadvertent spare references to alcohol[] and cannabis abuse[] as if an attempt at

implicit credibility undercutting."  Doc. 15, p. 20 (citing Tr. 22, 24).  He states, "Alcohol abuse

is not a factor to be considered in determining the weight to be given to a treating-source opinion." Doc. 15, p. 19. Zehner's argument lacks merit. First, there is no treating source opinion in the record. Next, the ALJ's reference to substance abuse twice in her ten-page analysis, once when she described Zehner's testimony and once when she accurately stated that Zehner had been diagnosed with cannabis abuse, is not error and does not demonstrate that the ALJ implicitly undercut Zehner's credibility.

### F. The ALJ did not err when she relied on the VE testimony

Zehner argues that, due to his hand problems, it is "not believable" that he could perform the work the VE stated he could perform: bonder, assembler, and bench worker. Doc. 15, p. 21; Tr. 88, 28. Therefore, he claims, it was error for the ALJ to rely on the VE's testimony as evidence of jobs Zehner could perform. Doc. 15, pp. 21-22. This argument fails. First, Zehner's attorney did not challenge the VE's answer at the hearing; in fact, he asked the VE no questions at all despite being invited to do so. Thus, he has waived any challenge to the VE's testimony. Moreover, the ALJ did what was required: she asked the VE if his testimony was in conflict with the DOT. The VE stated that his testimony was not in conflict with the DOT and the ALJ was not required to investigate further. *See* SSR 00-4p, 2000 WL 1898704, at *2 (the ALJ shall inquire at the hearing whether the VE's testimony is consistent with the DOT; unless a conflict exists, the ALJ has no further duty to investigate the VE's testimony and may rely on it); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009). Finally, the ALJ found that Zehner could frequently handle and finger; Zehner has not shown that the jobs identified by the VE require more than frequent handling and fingering. Tr. 21. In short, the ALJ did not err by relying on the VE's testimony.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: November 19, 2019

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).